The YOUNGSTOWN CARTAGE
COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

The YOUNGSTOWN CARTAGE
CO., Petitioner,

v.

The INTERSTATE COMMERCE COM-
MISSION and United States of
America, Respondents,

Associated Truck Lines, Inc., Intervenor.

Nos. 76–1225 and 77–1337.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 12, 1977.

Decided Feb. 23, 1978.

John P. McMahon, Columbus, Ohio, for
petitioner.

L. Marie Guillory, Atty., I. C. C., with
whom Mark L. Evans, Gen. Counsel, Fred-
erick W. Read, III, Associate Gen. Counsel,
I. C. C. and Robert L. Thompson, Atty.,
Dept. of Justice, Washington, D. C., were
on the brief, for respondents in No. 77–
1337.

Charles H. White, Jr., Associate Gen.
Counsel, Alan J. Theimann, Atty., I. C. C.,
Barry Grossman and Joen Grant, Attys.,
Dept. of Justice, Washington, D. C., were
on the brief, for respondents in No. 76–
1225.

Raymond Michael Ripple, Atty., I. C. C.
and Lloyd John Osborn, Atty., Dept. of
Justice, Washington, D. C., also entered ap-
pearances for respondents in No. 76–1225.

Susan J. Atkinson, Atty., Dept. of Justice,
Washington, D. C., also entered an appear-
ance for respondent in No. 77–1337.

Earl E. Meisenbach, Grand Rapids, Mich.,
also entered an appearance for intervenor.

Before BAZELON, Chief Judge, LEV-
ENTHAL and ROBINSON, Circuit Judges.

PER CURIAM.

█ This Court has before it consolidated
appeals from two orders of the Interstate
Commerce Commission (ICC). Appeal No.
76–1225 involves a Commission ruling that
an application by the Youngstown Cartage
Company (YCC) for gateway elimination,
which was filed pursuant to the ICC's

recent gateway elimination rules,[1] was fatally defective. In support of its fourteen part application to eliminate gateways the carrier filed a list of some 800 shipments carried during the years 1972 and 1973.

The Commission held that the applicant had failed to indicate which shipments were transported over which gateways, thereby precluding a determination that YCC had been a substantial competitor for each of its fourteen proposed authorities, as required under *Childress—Elimination Sanford Gateway*, 61 M.C.C. 421 (1952). The Commission also found that YCC had failed to identify which shipments involved a circuity of less than 20% and were already the subject of E-Letter-Notices.[2]

In a petition for reconsideration the carrier identified 29 shipments out of the 800 as involving more than 20% circuity. But the carrier still failed to advise the Commission which part or parts of its fourteen part application were supported by evidence of these 29 shipments. We think the ICC was not unreasonable in requiring that the applicant meet the minimal procedural burden put on the carriers in order to help the agency with the formidable administrative burden of the gateway elimination program, particularly in view of the benefits that program conferred on the carriers.

*No. 77–1337*

■ The effect of the ICC's action was to require that YCC discontinue "tacking"

these irregular routes on and after January 22, 1976.[3] On January 21, 1976, the carrier filed a new application for the direct operating authority that it had sought unsuccessfully in its gateway elimination application. This second application did differ from the first in some material respects. It included shipping data for the years 1974 and 1975 as well as 1972 and 1973. It also was a twelve rather than fourteen part application.[4] The original application had been recast so as to eliminate duplication with authorities that the carrier had received in the interim through E-Letter-Notices.[5]

Under the ICC's gateway elimination rules, carriers that did not file applications prior to June 4, 1974, lost authority to tack their authorized routes. In view of the late filing, the Commission did not process YCC's second application under the gateway elimination rules, but instead treated the application as one for new operating authority under § 207 of the Interstate Commerce Act, which embodies a public convenience and necessity standard.[6] The application was denied on the ground that YCC proffered no shipper support for its application and therefore failed to make out a prima facie case of public need as required by *Novak Contract Carrier Application*, 103 M.C.C. 555 (1967).

Traditionally an applicant shows shipper support by filing affidavits of shippers indi-

---

1. 49 C.F.R. § 1065.1 (1976).

   Historically, motor common carriers have been free to provide through service by combining two or more authorized routes at common geographical points of service ("gateways"). Use of such gateways commonly involved a degree of circuity, *i. e.*, more driving miles than would be required by a direct route. The gateway elimination rules were prompted by the energy crisis and a consequent desire to reduce the circuity involved in transporting shipments. Those rules provided procedures whereby carriers could obtain authority to provide direct service between points currently linked by gateways.

2. In cases where the gateway routes involved circuity of less than 20%, carriers could obtain direct operating authority through a simplified procedure involving the filing of "E-Letter-Notices." For routes involving more than 20% circuity, the carriers were required to file "G"

applications. These applications were for additional certificates specifically authorizing the direct operations and required a showing that the applicant had actually transported goods between the points involved.

3.· "Tacking" in motor common carrier parlance refers to the linking of two separate grants of authority through gateways.

4. Two parts of the twelve part application were not supported by traffic exhibits. Those parts are dropped from consideration on this appeal, with petitioner's acquiescence, because there was no attempted showing that YCC was a substantial competitor along those routes.

5. *See* note 2 *supra*.

6. 49 U.S.C. § 307 (1970).

cating that they intend to use the service if it is authorized by the agency. This is logical because normally there is no history of service by the applicant over the route. The exception to the shipper affidavit requirement has been in cases involving the elimination of gateways, since a history of service had been generated by permissive tacking and the carrier was required to maintain in its application that elimination of the gateway would not result in a new service.[7] YCC maintains that its second application should have been held to this more permissive standard.

The Commission has taken the view that the standard reflected in the gateway elimination exception to the shipper affidavit rule is applicable only when the carrier has a continuing tacking authority. YCC's application was filed on the day before the effective date of the denial of its gateway application. It had no ongoing tacking authority. As noted, the gateway regulations specifically established June 4, 1974, as the final date for the filing of applications for the elimination of gateways. operations that did not receive approval under the regulations were prohibited after that date.[8] The gateway elimination rules also barred duplicate applications.

It is apparent that this case involves issues of regulatory policy and internal administration of Commission operations. We are not free to select the rules we think best. The Commission must be given considerable leeway in control of its calendar. *Dart Trucking Co. v. United States*, 555 F.2d 555 (6th Cir. 1977). Our charter permits intervention only when we can say that the Commission has acted in a way that is arbitrary and capricious. We do not think that the Commission was acting in an arbitrary and capricious manner when it put its special gateway program, conceived in 1973 in an effort to cope with the energy emergency, under rigorous time limits, and decided that in subsequent applications it would apply the standards for shipper support that are normally employed in evaluating applications for new authority.[9]

*Affirmed.*

---

**7.** Childress—Elimination of Sanford Gateway, 61 M.C.C. 421, 428 (1952):

In an application such as the instant one, involving the elimination of a gateway and seeking authority which would enable operation over more direct routes, the essential facts to be determined, in the absence of testimony by public witnesses, are (1) whether applicant is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway and, in so operating, is effectively and efficiently competing with the existing carriers, and (2) whether the elimination of the gateway requirement would enable applicant to institute a new service or a service so different from that presently provided as to materially improve applicant's competitive position to the detriment of existing carriers. In the former instance, a grant of the authority sought is justified solely upon proof that the proposed operation would result in operating economies, which

although primarily a benefit to the applicant, indirectly benefit the public through the medium of more efficient and economical service. In the latter instance, however, where the elimination of the gateway requirement would allow a new service, or would provide applicant with a substantial competitive advantage not previously enjoyed, it is incumbent upon applicant to prove public convenience and necessity the same as in any other application for new authority.

**8.** 49 C.F.R. § 1065.1(b) (1976).

**9.** As of January 22, 1976, YCC was not able to tack through the subject gateways. The customers who had depended on this tacking authority were required to find new carriers. The Commission was obviously justified in requiring evidence that YCC would be able to attract shippers—new ones, old customers regained or both.